## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON DIVISION

REAGAN LANETTE BERRY,

      Plaintiff,

v.                                CIVIL ACTION NO. 3:19-cv-00259

ANDREW SAUL,[1]
Commissioner of Social Security,

      Defendant.

### PROPOSED FINDINGS & RECOMMENDATION

      Plaintiff Reagan Lanette Berry ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33, and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83f.  By standing order entered on January 4, 2016, and filed in this case on April 10, 2019, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  (ECF No. 3.)  Presently pending before this Court are Claimant's Motion for Judgment on the Pleadings and Brief in Support of Motion for Judgment on the

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d).  *See also* 42 U.S.C. § 405(g) (stating that action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

Pleadings (ECF Nos. 12, 13) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 16).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 12), **GRANT** the Commissioner's request to affirm his decision (ECF No. 16), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.   BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 31 years old at the time of her alleged disability onset date and 37 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 289, 293.)[2] She is a high school graduate. (*Id.* at 38–39, 326.) Most recently, she was self-employed as a babysitter, and she has also worked as a bill collector and pressed clothes at a dry cleaner. (*Id.* at 40–44, 314.) Claimant alleges that she became disabled on December 31, 2011, due to a heart condition, osteoarthritis, carpal tunnel syndrome, panic disorder, and agoraphobia. (*Id.* at 289, 293, 325.)

Claimant filed her applications for benefits on March 23, 2016. (*Id.* at 289–301.)[3] Her claims were initially denied on May 4, 2016, and again upon reconsideration on August 3, 2016. (*Id.* at 180–90, 202–17.) Thereafter, on August 23, 2016, Claimant filed a written request for hearing. (*Id.* at 218–22.) An administrative hearing was held before an ALJ on February 21, 2018, in Huntington, West Virginia, with the ALJ appearing from

---

[2] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 7.
[3] The ALJ's decision states that Claimant filed her applications for benefits on March 16, 2016 (Tr. at 15), but the applications in the record are dated March 23, 2016 (*id.* at 289–301). The actual date appears immaterial.

Baltimore, Maryland. (*Id.* at 33–67.) On March 21, 2018, the ALJ entered an unfavorable decision. (*Id.* at 12–32.) Claimant then sought review of the ALJ's decision by the Appeals Council on May 18, 2018. (*Id.* at 280–88.) The Appeals Council denied Claimant's request for review on February 14, 2019, and the ALJ's decision became the final decision of the Commissioner on that date. (*Id.* at 1–6.)

Claimant timely brought the present action on April 9, 2019, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2.) The Commissioner filed an Answer (ECF No. 6) and a transcript of the administrative proceedings (ECF No. 7). Claimant subsequently filed her Motion for Judgment on the Pleadings and Brief in Support of Motion for Judgment on the Pleadings (ECF Nos. 12, 13), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 16). As such, this matter is fully briefed and ready for resolution.

*B. Relevant Medical Evidence*

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

*1. Treatment for Back and Lower Extremity Pain*

On January 26, 2012, Claimant presented to the emergency room, complaining of "severe" pain in her lumbar spine that began one month prior after she slipped and fell at home. (Tr. at 1740.) Her back was tender in the "lumbar area," and she had decreased range of motion on flexion and extension. (*Id.* at 1741.) An x-ray revealed evidence of levoscoliosis but was otherwise unremarkable. (*Id.*) Claimant was diagnosed with back pain and prescribed pain medication and a muscle relaxer. (*Id.* at 1741–42.)

Claimant again presented to the emergency room on July 15, 2012, complaining of "moderate" lower back and chest pain caused by a fall at home. (*Id.* at 1648.) Upon physical examination, there was muscle tenderness in Claimant's back, but her range of motion was normal. (*Id.* at 1649.) X-rays of Claimant's lumbar spine and pelvis were negative. (*Id.*) She was diagnosed with a low back strain and prescribed a muscle relaxer. (*Id.*)

Claimant presented to the emergency room on September 19, 2012, complaining of "severe" pain and "grinding" in her right knee after she twisted and hyperextended it while walking. (*Id.* at 1623.) Although Claimant "complain[ed] of pain on weight bearing," there was "[n]o swelling, tingling, weakness, numbness or suspected foreign body." (*Id.*) Upon physical examination, Claimant walked with a limp. (*Id.* at 1625.) The examiner noted "mild tenderness located in the medial joint line" of her right knee and "[l]imited [range of motion] secondary to pain." (*Id.*) However, an x-ray was negative, and there was "[n]o change from 08/05/2011." (*Id.* at 1628.) Claimant was given pain medication and instructed to apply ice to the knee. (*Id.* at 1625.) She was also referred to an orthopedic surgeon. (*Id.*)

Five days later, on September 24, 2012, Claimant presented to the emergency room complaining of back pain that began when she was lifting a laundry basket three days earlier. (*Id.* at 1616.) She reported "moderate" pain in her lumbar spine that radiated into her legs and was "worsened by standing or walking." (*Id.*) It was noted that Claimant "was seen recently at this facility (This is the patient's 24th pain related visit this year.)." (*Id.*)[4] Upon physical examination, Claimant's back appeared normal. (*Id.* at 1617.) There

---

[4] Regarding this commentary, the ALJ observed, "The record notes several injuries due to falls or aggressive behavior from 2012 through 2014. These injuries stopped after [Claimant's] divorce. This suggests she was in an abusive relationship." (Tr. at 24 n.1.)

was "[m]ild soft tissue tenderness in the right lower lumbar area" but "[p]ainless [range of motion]." (*Id.*) Claimant also had a normal range of motion in her extremities. (*Id.*) Imaging of Claimant's lumbar spine revealed "[c]hronic levo-scoliosis with scoliosis angle measured between T10 and L3 of 30 degrees," and the findings were similar to the imaging conducted on July 15, 2012. (*Id.* at 1620.) Claimant was diagnosed with an acute back strain and "referred to the spine center." (*Id.* at 1617.)

On February 19, 2013, Claimant presented to the emergency room, complaining of a lower back injury after a fall at home. (*Id.* at 1584.) She reported "moderate pain" but "no pain on weight bearing." (*Id.*) A physical examination revealed tenderness in the "lower lumbar area" but "[n]o vertebral point tenderness, muscle spasm or limitation in [range of motion]." (*Id.* at 1585.) Claimant was observed to have "[n]o limping gait." (*Id.*) Imaging was unremarkable. (*Id.* at 1586.) She was diagnosed with a contusion and prescribed pain medication. (*Id.*)

Claimant again presented to the emergency room on March 14, 2013, complaining of "moderate pain" in her right knee and ankle after a fall down one stair. (*Id.* at 1573.) Upon physical examination, she had "moderate tenderness and mild swelling" in her right knee and "moderate tenderness" in her right ankle. (*Id.* at 1574.) Her range of motion was limited "secondary to pain" in both her knee and her ankle. (*Id.*) Imaging of the knee and ankle was "negative." (*Id.*) Claimant was diagnosed with a sprained right knee and ankle and was prescribed medication and directed to apply ice to the injury. (*Id.* at 1574–75.)

Just over a month later, on April 24, 2013, Claimant presented to the emergency room with "severe" left leg pain that began after she "stepped awkwardly off the curb going after [a basketball]." (*Id.* at 1562.) Upon physical examination, Claimant had

5

"moderate tenderness" in her left knee and ankle and "[l]imited [range of motion] secondary to pain" but no swelling, and x-rays were "negative." (*Id*. at 1563.) She was diagnosed with a sprained knee and ankle, prescribed medication, and instructed to apply ice and use crutches. (*Id*. at 1564.)

Claimant returned to the emergency room several weeks later, on May 8, 2013, continuing to complain of lower extremity pain caused by the April 24 fall. (*Id*. at 1558.) It was noted that she "was seen recently at this facility (7th ED visit this year)." (*Id*.) There was "moderate tenderness" in Claimant's left foot, and it was noted, "Foot exam grossly negative. Pain out of proportion to findings." (*Id*. at 1559.) An x-ray of Claimant's left foot revealed "[n]o fracture" and "[n]ormal alignment." (*Id*.) It was noted that Claimant had "crutches at home." (*Id*.) She was diagnosed with a sprained left foot and again instructed to apply ice, wrap her foot with a bandage, and use crutches. (*Id*. at 1560.)

Claimant presented to the emergency room again on September 3, 2013, complaining of "severe" pain in her lumbar spine that radiated to her buttocks. (*Id*. at 1485.) She stated that she injured herself while getting out of her vehicle. (*Id*.) It was noted that Claimant "was seen recently at this facility" and "frequents this ER for various complaints, usually pain related" and that she "has been here an average of twice a month for the past 7 months." (*Id*.) Upon physical examination, there was "[m]oderate soft tissue tenderness in the mid central lumbar area" and "[s]everely limited [range of motion] in the back" upon flexion and rotation. (*Id*. at 1486.) She was diagnosed with an acute lumbar strain, prescribed medication, and directed to apply ice several times per day. (*Id*. at 1487.) Several weeks later, on September 30, 2013, Claimant presented to her primary care provider, complaining of swelling in her hands and feet. (*Id*. at 984.)

She also reported that "she twisted her back getting out of a car" and was experiencing "pains [that] shoot down her leg." (*Id.*) She told her provider that she went to the emergency room for her back and leg pain and was given a muscle relaxer, but it was "still not helping." (*Id.*) Her provider's physical examination findings were unremarkable. (*Id.* at 984–85.) She was diagnosed with lumbago and prescribed medication. (*Id.* at 985.)

At an appointment with her primary care provider on February 18, 2014, Claimant reported that her "[k]nee pain [f]eels as if someone hit her with a baseball bat," but the provider's physical examination findings were noted to be "stable." (*Id.* at 975–76.)

On February 3, 2015, Claimant presented to a new primary care provider to establish care and complained of "pain in both knees" that was an "ongoing problem . . . and seems to be getting worse." (*Id.* at 963.) She also reported "chronic low back pain with little benefit from [medication]." (*Id.*) Upon physical examination, the physician observed no swelling, tenderness, or instability in Claimant's knees, but her "motion was abnormal painful [sic] with extension more on left than right," and "[c]repitus on motion was noted" bilaterally. (*Id.* at 965.) Claimant also had a positive McMurray test on the left knee. (*Id.*) The physician further observed tenderness in Claimant's lumbosacral spine. (*Id.*) She was diagnosed with bilateral knee osteoarthritis, lumbago, and knee-joint disorder. (*Id.* at 966.) Claimant was prescribed medication for her back pain and referred to an orthopedist for her knee osteoarthritis. (*Id.*)

Claimant presented to the orthopedic surgeon for her knee pain on April 23, 2015. (*Id.* at 1030–32.) She reported experiencing pain for the preceding eighteen months, with occasional swelling and decreased range of motion on extension. (*Id.* at 1030.) Upon physical examination, the orthopedic surgeon observed that Claimant had a normal gait. (*Id.*) He noted no swelling in either knee, but there was "mild crepitus with motion" in

both knees and tenderness in the left knee. (*Id.* at 1030–31.) McMurray tests were negative in both knees. (*Id.*) An x-ray revealed "mild patellofemoral spurring." (*Id.* at 1031.) Claimant was diagnosed with chondromalacia of patella, and the orthopedic surgeon recommended that she do at-home physical therapy exercises to stretch her hamstrings and strengthen her quadriceps. (*Id.*)

On December 14, 2015, Claimant presented to a walk-in primary care clinic and complained "that it feels like her right knee has a rubber band around it." (*Id.* at 1243.) Upon physical examination, the nurse practitioner observed pain "elicited by motion" but "[n]o instability" in Claimant's right knee. (*Id.* at 1245.) Claimant was directed to use over-the-counter medication and referred to physical therapy. (*Id.* at 1245–46.)

On March 7, 2016, Claimant reported knee pain to her new primary care provider. (*Id.* at 1057, 1332.) Upon physical examination, her provider noted that her strength was "normal in all extremities" and that her "gait appears normal and is unassisted." (*Id.* at 1061, 1336.) He recommended physical therapy. (*Id.* at 1062, 1337.) Claimant had her first physical therapy appointment on March 31, 2016. (*Id.* at 1055–56.) She reported to her physical therapist that "she has had knee pain since she was a child." (*Id.* at 1055.) She also stated that she had previously used a topical cream "without an improvement." (*Id.*) The physical therapist noted that Claimant walked independently "with difficulty" and that she had decreased strength and range of motion upon flexion and extension. (*Id.*) He suggested physical therapy twice per week for six weeks, with "a home program." (*Id.*)

At her next physical therapy appointment on April 5, 2016, Claimant reported that she was experiencing pain in her back and left leg "in addition to her bilateral knee pain . . . since her last therapy visit." (*Id.* at 1339.) The physical therapist advised her "to follow

up with her family physician regarding her back pain." (*Id.*)  His findings with respect to the strength and range of motion in Claimant's knees were unchanged since the first visit, but he noted that she had "[f]unctional hip and ankle motion" and "ambulat[ed] . . . with equal [weight] bearing in neutral posture and no assistive devices." (*Id.*)  On April 7, 2016, Claimant told her physical therapist that her back pain "started while walking at [W]almart" but "denie[d] experiencing any back pain during therapy." (*Id.* at 1338.)

Claimant presented to her primary care provider on April 13, 2016, complaining of lower back pain on her left side that radiated into her left leg, which she attributed to starting physical therapy for her knee. (*Id.* at 1048.)  Her physician noted that her deep tendon reflexes were "diffusely absent" bilaterally at the knee and ankle, but she had full strength in her knees and ankles "with flexion and extension." (*Id.* at 1049.)  She was diagnosed with left-side lumbar radiculopathy, prescribed pain medication, and ordered to continue physical therapy. (*Id.* at 1050.)  At her physical therapy appointment the following day, the physical therapist's observations were unchanged from Claimant's initial appointment on March 31, 2016. (*Id.* at 1046.)  The physical therapist noted that Claimant was "non specific as it pertains to posture or activity which exacerbates her symptoms." (*Id.* at 1356.)  He further observed that Claimant had "poor trunk strength." (*Id.*)  Claimant attended only one of her scheduled physical therapy appointments after that day. (*Id.* at 1353, 1361.)

On April 20, 2016, Claimant returned to her primary care provider for a follow-up appointment for her back pain. (*Id.* at 1041.)  Her physician again observed that Claimant had full strength in her lower extremities "with flexion and extension at knee and ankle bilaterally." (*Id.* at 1042.)  She was prescribed a lidocaine patch and directed to follow up in three weeks. (*Id.* at 1043.)   At her follow-up visit on May 18, 2016, Claimant reported

continued pain and told her physician that physical therapy and medication did not help to relieve it. (*Id.* at 1037.) Claimant's physician observed that she "appears mildly uncomfortable" but again noted that she had full strength in her lower extremities "with flexion and extension at knee and ankle bilaterally." (*Id.* at 1037–38.) He ordered imaging of her lumbar spine and a referral to a neurosurgeon. (*Id.*) On July 30, 2016, Claimant's physician observed that "she appears in a great deal less pain today than she had several months ago" and noted that she had a pending neurosurgery appointment. (*Id.* at 1961.)

Imaging of Claimant's left knee conducted on August 9, 2016, revealed "[m]ild degenerative change." (*Id.* at 1965.) "Mild osteoarthritis" was observed in her right knee as well. (*Id.* at 1968.) She was also noted to have mild "[b]ilateral hip osteoarthritis." (*Id.* at 1966.) Imaging of her lumbar spine revealed mild degenerative changes at the L5-S1 vertebrae, as well as scoliosis. (*Id.* at 1967.)

Claimant presented to a new primary care provider on December 20, 2016, complaining of back pain and "sharp pain down [her] right leg." (*Id.* at 1985.) She was instructed to increase her pain medication and given a muscle relaxer. (*Id.* at 1989.) Claimant returned for a follow-up appointment on January 31, 2017, and reported that she had "breakthrough" back pain, but it was "controlled mostly" with pain medication. (*Id.* at 1990.) Upon physical examination, her range of motion on forward bend was observed to be abnormal. (*Id.* at 1993.)

2. *Claimant's Hearing Testimony*

At the hearing, Claimant's counsel began by questioning Claimant about her osteoarthritis. (*Id.* at 45.) Claimant testified that it affected her knees and hips, and her pain exceeded five on a one-to-ten scale three or four days per week. (*Id.*) She testified

that her knees "get extremely stiff" and become difficult to move, and she had difficulty changing positions. (*Id*. at 46.) Claimant estimated that she could stand for five minutes before needing to rest, walk for five to six minutes, and sit for five to ten minutes. (*Id*. at 46, 50.) She stated that she had trouble going up stairs because her "knees grind" and her hips felt inflexible. (*Id*. at 47.) She testified that she was largely unable to perform household chores "[b]ecause of the pain" and that she had a home health aide to assist her five days per week. (*Id*. at 47–48, 53.) She explained that if she ran the vacuum cleaner or sat and washed her dishes, she "can't do anything hardly the next day." (*Id*. at 50.)

Claimant's counsel also asked Claimant about her carpal tunnel syndrome. (*Id*. at 48.) Claimant testified that she was unable to hold her phone, pick things up, or play video games with her son. (*Id*. at 48, 54.) She stated that she experienced numbness and pain "every day." (*Id*. at 48–49.) She also stated that she had surgery, but it did not help "at all," and her right hand was worse than it was before the surgery. (*Id*. at 49.) She testified that she had difficulty writing with a pencil and using a television remote. (*Id*.)

### 3. *Vocational Expert's Hearing Testimony*

The ALJ began her questioning by asking the vocational expert ("VE") to confirm that her "resume in the file [was] a true and accurate description of [her] professional qualifications." (*Id*. at 57.) When she asked Claimant's counsel if there was "any objection to [the VE's] qualifications to testify," Claimant's counsel responded, "I didn't see her resume in the file, so I would preserve the objection." (*Id*. at 58.) The ALJ replied, "It's in there." (*Id*.) She checked to make sure, confirmed that the VE's résumé was part of the administrative record, and stated, "It was probably just put in after you looked at [the record], so it is there." (*Id*.) Claimant's counsel stated, "Okay." (*Id*.)

The ALJ then asked the VE to classify Claimant's past work. (*Id.*) The VE testified that Claimant previously worked as a collector and an automatic presser and gave the *Dictionary of Occupational Titles* information for those jobs. (*Id.*) Next, the ALJ asked the VE to "assume an individual of the same age, education, and work experience as the Claimant" who "can perform light work, occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds, occasionally balance, stoop, kneel and crouch, never crawl, avoid concentrated exposure to temperature extremes and hazards, including unprotected heights and moving mechanical parts, can perform simple, routine tasks, but not at a production rate pace, and have occasional superficial interaction with the public." (*Id.* at 59.) The VE testified that Claimant's past work would be "excluded" for such an individual. (*Id.*) However, she testified that such an individual would be capable of working as a photocopying-machine operator, a router, or a shirt presser. (*Id.* at 59–60.) The ALJ then asked the VE about "the maximum percentage of time an employee can be off task before it becomes work preclusive," and the VE responded, "10%." (*Id.* at 60.) Finally, the ALJ asked the VE the same question with respect to absences, and the VE answered, "One per month, maximum." (*Id.*)

Claimant's attorney began his questioning of the VE by asking her if a shirt presser would be required to work at a production rate pace. (*Id.* at 61.) The VE responded that a shirt presser working at a laundromat or a hotel would not have to work at such a pace. (*Id.*) Claimant's attorney next asked the VE to "tell [him] what a router is," and the VE explained that "it's what we know as a dispatcher." (*Id.*) He asked her if "a dispatcher work[s] with simple, routine tasks" or is "tasked with solving problems to get people to places on time." (*Id.* at 61–62.) The VE answered, "this is a simple, routine task job." (*Id.* at 62.)

Claimant's counsel then asked the VE to "keep everything that was in the hypothetical that the [ALJ] posited and . . . add to that the need for frequent postural changes, that the job have a sit/stand option, standing no more than two hours per day, total, and . . . that the hypothetical Claimant would be limited to no task involving fine manipulation of the fingers or hands." (*Id.*) He asked if the "other work that [the VE] suggested" would be "rule[d] out" under that hypothetical, and the VE responded in the affirmative, explaining "that these jobs require a significant amount of standing." (*Id.*) Claimant's counsel asked the VE if there were other jobs available for the hypothetical individual he described, and the ALJ testified that jobs were available at the sedentary level. (*Id.*) She identified the examples of ticket taker, ticket seller, and information clerk, but clarified that "all might require some sort of fine manipulation, so a job that does not require fine manipulation, this sit/stand job might not exist." (*Id.* at 63–64.) Upon further questioning, the VE testified that there were no jobs available for the hypothetical individual Claimant's counsel asked the VE to imagine "due to the limitation of the fine manipulation." (*Id.* at 65.) Claimant's attorney informed the ALJ, "I will preserve my objection. A great deal of this is not consistent." (*Id.* at 66.) He explained, "[W]ith these limitations and with the fact that she's going to be off task more than 10% of the time, miss more than a day a week . . . there's no other work." (*Id.*)

## C. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential

evaluation process to aid in this determination.    20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017).  The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments.  *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001).  An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled."    20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).   "A claimant is entitled to a conclusive

presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'"  *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step.  *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e).  The claimant's RFC reflects "her ability to perform work despite her limitations."  *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work."  *Lewis*, 858 F.3d at 862.  "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]."   20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659.  Considering the claimant's

"pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a [VE] responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements through March 31, 2016. (Tr. at 17.) She further determined that Claimant had not engaged in substantial gainful activity since the alleged onset of her disability. (*Id*.) She found that Claimant's atrioseptal defect, depression, anxiety, scoliosis, obesity, venous insufficiency, bilateral osteoarthritis in her knees and hips, and obstructive sleep apnea constituted "severe" impairments. (*Id*.) However, she found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*. at 18–20.) Upon assessing Claimant's RFC, the ALJ determined that Claimant is able "to perform light work," except she could "occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, and crouch; [and] never crawl." (*Id*. at 20.) In addition, the ALJ found that Claimant should "avoid concentrated exposure to temperature extremes and hazards, including unprotected heights and moving mechanical parts; can perform simple routine tasks, but not at a production rate pace; and [can] have occasional superficial interaction with the public." (*Id*.)

The ALJ concluded that given the limitations imposed by the Claimant's RFC, she was unable to perform her past relevant work. (*Id*. at 25–26.) She noted that Claimant is "a younger individual" with "at least a high school education" and that "[t]ransferability of job skills [was] not material to the determination of disability." (*Id*. at 26.) Because the ALJ determined that Claimant was unable to perform the full range of light work, she enlisted a VE to aid in her finding that Claimant is capable of working as a photocopying machine operator, router, or shirt presser. (*Id*. at 26–27.) As a result, the ALJ concluded

that Claimant was not "under a disability . . . from December 31, 2011, through the date of this decision." (*Id*. at 27.)

## II.     LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id*. (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id*. (quoting *Craig*, 76 F.3d at 589).

## III.     ANALYSIS

Claimant argues that the ALJ "ignored" record evidence that contradicted her RFC assessment of Claimant. (ECF No. 13 at 7–9.) She further asserts that the ALJ improperly relied on the VE's hearing testimony because the VE should have been disqualified from testifying. (*Id*. at 5–7.) And she argues that even if the VE were qualified to testify, the

ALJ's hypotheticals to the VE did not accurately reflect Claimant's limitations. (*Id.* at 10–13.) Claimant asks this Court to reverse the Commissioner's decision and award her benefits or to reverse the Commissioner's decision and remand this matter to the ALJ. (*Id.* at 14.) The Commissioner responds that the ALJ's decision accurately represents the facts in the record and that the RFC assessment is supported by substantial evidence. (ECF No. 16 at 7–8, 8–12.) He also contends that the VE was qualified to testify and that the ALJ adopted the VE's testimony with respect to the hypotheticals that were supported by the record. (*Id.* at 5–7, 8.)

A. *RFC Assessment*

Claimant argues that in conducting the RFC assessment, the ALJ failed to consider all the evidence in the record and misstated the facts to conclude that Claimant was able to function at a high level. (ECF No. 13 at 7–9.) When conducting the RFC assessment, "the ALJ uses all the relevant evidence, medical or otherwise, to determine a claimant's 'ability to meet the physical, mental, sensory, and other requirements of work.'" *Ladda v. Berryhill*, 749 F. App'x 166, 172 (4th Cir. 2018) (quoting 20 C.F.R. §§ 404.1545, 416.945). As an initial matter, to the extent Claimant asserts that the ALJ was required to discuss the entirety of the evidence in the record as part of the RFC assessment, such a contention is plainly incorrect: "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in [her] decision." *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2016) (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curiam)); *Davenport v. Comm'r, Soc. Sec. Admin.*, No. SAG-13-739, 2013 WL 5883462, at *2 (D. Md. Oct. 29, 2013) ("[A]n ALJ is not required to address every piece of evidence in the record, so long as a reviewing court can determine from the opinion 'what the ALJ did and why [s]he did it.'" (quoting *Piney Mountain Coal Co. v. Mays*, 176

F.3d 753, 762 n.10 (4th Cir. 1999))); *see Wallace v. Berryhill*, No. 1:17-cv-01218, 2017 WL 3782787, at *13 (S.D.W. Va. July 21, 2017) ("[T]hough the ALJ herein gave a thorough review of the available evidence of record, assuming *arguendo* that the ALJ failed to consider every piece of evidence, such is not the standard, because the issue before the Court is whether the ALJ's decision is supported by substantial evidence, not if she mentioned a particular piece of evidence."), *adopted by* 2017 WL 3763848 (S.D.W. Va. Aug. 30, 2017).  But the "RFC assessment 'must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." *Ladda*, 749 F. App'x at 172 (quoting SSR 96-8p (July 2, 1996)).

Here, the ALJ explained that she based her RFC assessment of Claimant largely on the opinions of the state-agency consultants.  (Tr. at 21, 25.)  With respect to Claimant's physical limitations, the ALJ stated,

> The record supports the Claimant has a history of heart issues and a heart surgery.  After her surgery, she was fairly active.  She would do most chores and yardwork.  She would take care of her family.  Accordingly, she only required preventative heart limitations.  The claimant's back and joint records only suggested mild/moderate symptoms and treatment.  Additionally, her activities suggested she did not require significant limitations from these ailments.  Her 2017 issues including a seizure only occurred on one occasion and it appears to have been controlled with medication.

(Tr. at 21.)  She then reviewed Claimant's medical treatment during the relevant period and explained which evidence supported the state-agency consultants' evaluation of Claimant's functional abilities on which she relied.  (*Id*. at 21–23.)  The ALJ summarized,

> Overall, the claimant struggles with milder/moderate limitations, and she performs most activities. She has not had consistent issues with her heart. She had one minor bout with seizures. Her back and knee images, as well as objective tests supported milder limitations. Additionally, her activities suggested good functioning. As such, based on the state consultant assessments, as supported by the record, due to her heart history, the claimant requires standard heart limitations. Additionally, the combination of her back pain, arthritis and sleep apnea, support the claimant is limited to light work. Due to her back, knee, and weight, she can occasionally climb ramps and stairs. Her back, knee, weight, and heart restrict her to never climb ladders, ropes, or scaffolds and occasionally balance, stoop, kneel, and crouch, but never crawl. Due to her heart and seizure history, she should avoid concentrated exposure to temperature extremes and hazards, including unprotected heights and moving mechanical parts.

(*Id.* at 23.)

The ALJ conducted a similar analysis with respect to Claimant's mental limitations, first explaining why she gave "significant weight" to the opinions of the state-agency psychological consultants:

> The claimant struggled with anxiety and sought regular mental health treatment. She also took mental health medication. Her anxiety increased in crowds. This was her most significant issue. The claimant was independent in most activities. She did most chores and was able to handle money. She was responsible for her son. Her objective tests were generally normal. Her consultative examination only supported milder to moderate

abnormalities.  She was also able to date and get married during the alleged

period.  Also, the claimant was able to care for her mother and son, take

them to doctor visits, coordinate her son's schooling, and meet others.  The

record suggests she has no restrictions in adaptation.  [One of the state-

agency psychological consultants] found the claimant to have borderline

intellectual functioning.  The claimant's only support for this is a record

from her school over 10 years before her onset date and it was mostly related

to her grades.

(*Id*. at 24.)    The ALJ next reviewed Claimant's mental health treatment and her

statements about her symptoms and daily activities.  (*Id*. at 24–25.) She concluded,

Overall, the record supports a high level of functioning.  She can perform

most activities at home.  She regularly exercises and takes care of others.

Her objective tests were mostly normal.  Her most pressing issues was [sic]

crowds.  She is also easily overwhelmed and would have difficulty with

stressful work.  Accordingly, based on the state consultant assessments and

the claimant's regular therapy notes, the record suggests she requires low

stress work.  As such, she can perform simple routine tasks, but not at a

production rate pace.  Due to her fear of crowds, she can only have

occasional superficial interaction with the public.

(*Id*. at 25.)

Claimant refers to the ALJ's findings as "mistaken statements of fact" and argues,

essentially, that the ALJ should have accepted her hearing testimony about her daily

activities and functional abilities.  (ECF No. 13 at 8–9.)  But the ALJ is not required to

unquestioningly "accept all testimony given during the hearing as true."  *Linkous v.*

22

*Astrue*, No. 4:10-cv-16, 2011 WL 652534, at *10 (E.D. Va. Jan. 19, 2011), *adopted by* 2011 WL 642958 (E.D. Va. Feb. 10, 2011); *see Endicott v. Astrue*, No. 1:11-cv-00025, 2012 WL 397761, at *6 (W.D. Va. Feb. 4, 2012) ("[T]he ALJ was not required to take Endicott's claims [in her hearing testimony] at face value and as determinative of his decision."). Rather, the ALJ must evaluate the claimant's testimony and "make an independent determination" about the claimant's functional abilities while considering all the evidence in the record. *Linkous*, 2011 WL 652534, at *10 (citing 20 C.F.R. § 404.1529(a)). Put simply, the hearing testimony is but one piece of evidence the ALJ must consider and does not conclusively establish the claimant's functional limitations. *See Amy R. v. Saul*, No. 7:18-cv-00272, 2019 WL 4262514, at *7 (W.D. Va. Sept. 9, 2019) ("[T]he ALJ explained that he discounted Amy's account of the severity of her impairments because they were inconsistent with other evidence in the record and that explanation is a legitimate reason to discount her subjective complaints." (citing *Hines v. Barnhart*, 453 F.3d 559, 565 n.3 (4th Cir. 2006))). Importantly, "[t]he duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court." *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996) (citing *Kasey v. Sullivan*, 3 F.3d 75, 79 (4th Cir. 1993)); *see Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996))).

The ALJ's explanation of her RFC assessment, which is set out above, clearly reflects that she considered the entirety of the evidence and how Claimant's conditions impacted her functional abilities during the relevant period. (*See* Tr. at 20–25.) "[A] proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3)

conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019).   All three components are present in the ALJ's RFC assessment in this case.  (Tr. at 20–25.)

Notably, Claimant has not pointed to any record evidence aside from her hearing testimony to support her argument that a more restrictive physical RFC assessment was warranted.  (*See* ECF No. 13 at 7–9.)  With respect to her mental limitations, Claimant asserts that the ALJ erred by giving "no weight" to Claimant's Global Assessment of Functioning ("GAF") scores (*id*. at 9), but the ALJ explained why she did so: "GAF scores are situational and reflect the personalized assessment of the practitioner on the assessment date and include matters outside of the actual psychological functioning including legal, financial, and employment functioning" (Tr. at 25).  The ALJ's reasoning is consistent with the Social Security Administration's directive on the use of GAF scores. *See Woodbury v. Colvin*, 213 F. Supp. 3d 773, 781 (D.S.C. 2016) (quoting Soc. Sec. Admin., AM-13066, Global Assessment of Functioning (GAF) Evidence in Disability Adjudication (2013) [hereinafter AM-13066]).  That guidance instructs, "By itself, the GAF cannot be used to 'raise' or 'lower' someone's level of function."  AM-13066, *supra*. The ALJ cited to the treatment notes from Claimant's mental health providers to conclude that Claimant "requires low stress work" with "occasional superficial interaction with the public."  (Tr. at 25.)   Claimant also argues that the ALJ "ignored . . . [her] Special Education classes and lack of educational attainment" but fails to elaborate on how her performance in high school, from which she graduated in 1999, affected her ability to work during the relevant period from 2011 until 2018.  (ECF No. 13 at 9.)  The ALJ concluded that it did not.  (*See* Tr. at 24.)  And enrollment in special education courses is not itself indicative of work-preclusive functional limitations.  *See Huntley v. Saul*, No. 1:18-cv-389, 2019 WL 3779671, at *3–4 (M.D.N.C. Aug. 12, 2019) (concluding that ALJ

24

properly found intellectual disorder not severe based on "extensive analysis of Plaintiff's intellectual impairment and its effect on her ability to work").

In sum, the undersigned **FINDS** that the ALJ properly conducted the RFC assessment and that it is supported by substantial evidence.

### B. VE's Qualifications

Claimant further argues that the VE should have been disqualified from testifying at the hearing because her identity and qualifications were not timely disclosed prior to the hearing. (ECF No. 13 at 5–7.) In support of her argument, Claimant relies on several provisions of the *Hearings, Appeals, and Litigation Law* manual ("HALLEX") published by the Social Security Administration's Office of Disability Adjudication and Review. (*Id.*) Above all, "HALLEX is an internal guidance document." *Patterson v. Berryhill*, No. 9:17-cv-1899-MBS-BM, 2019 WL 1198550, at *5 (D.S.C. Mar. 14, 2019) (citing Frederick W. Watson, *Disability Claims, Guidance Documents, and the Problem of Nonlegislative Rules*, 80 U. Chi. L. Rev. 2037 (2013)). It "includes policy statements" and "defines procedures for carrying out policy and provides guidance for processing and adjudicating claims at the Hearing, Appeals Council and Civil Actions levels." *Id.* at *6 (quoting HALLEX I-1-0-1, 2005 WL 1863821, at *1).

However, as the Commissioner points out (ECF No. 16 at 5), HALLEX lacks the force of law and conveys no judicially enforceable rights to Claimant. *Moraes v. Comm'r of Soc. Sec.*, 645 F. App'x 182, 186 (3d Cir. 2016) ("HALLEX does not have the force of law . . . . (citing *Schweiker v. Hansen*, 450 U.S. 785, 789 (1981) (per curiam); *Lowry v. Barnhart*, 329 F.3d 1019, 1023 (9th Cir. 2003))); *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 399 (6th Cir. 2008) (stating that HALLEX is "not binding on this court"); *Clark v. Astrue*, 529 F.3d 1211, 1216 (9th Cir. 2008) ("HALLEX is strictly an internal Agency

manual, with no binding legal effect on the Administration or this court." (citing *Moore v. Apfel*, 216 F.3d 864, 868–69 (9th Cir. 2000)); *see Justiniano v. Soc. Sec. Admin.*, 876 F.3d 14, 29 (1st Cir. 2017) (stating that HALLEX is "not . . . binding on the agency"); *Davenport v. Astrue*, 417 F. App'x 544, 547–48 (7th Cir. 2011) (per curiam) (stating that violation of HALLEX procedures not equivalent to due process violation); *George v. Astrue*, 338 F. App'x 803, 805 (11th Cir. 2009) (per curiam) (referring to premise that "HALLEX carries the force of law" as "a very big assumption"); *see also Morgan v. Colvin*, 803 F.3d 773, 777 (5th Cir. 2015) ("[W]hile HALLEX does not carry the authority of law . . . where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than would otherwise be required, and if prejudice results from a violation, the result cannot stand." (quoting *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000)) (internal quotation marks omitted)); *Butterick v. Astrue*, 430 F. App'x 665, 666–67 (10th Cir. 2011) (declining to remand for HALLEX violation because claimant "has failed to show any prejudice").  Therefore, even a blatant violation of its terms does not inherently merit remand.  *Way v. Astrue*, 789 F. Supp. 2d 652, 665 (D.S.C. 2011) (report and recommendation of magistrate judge) ("HALLEX does not automatically have the force of law, so the Commissioner's failure to follow [it] does not automatically require reversal or remand."); *Overcash v. Astrue*, No. 5:07-cv-123-RLV, 2011 WL 815789, at *7 (W.D.N.C. Feb. 28, 2011) ("[P]resumed noncompliance, standing alone, [does] not suffice to trigger remand.").

Further, even assuming that HALLEX conveys rights upon Claimant and that its procedures were violated because the VE's résumé was incorrectly filed in the "E" section of the administrative record instead of the "B" section and was not available to Claimant prior to the hearing (*see* ECF No. 13 at 5–6), Claimant was not prejudiced by the violation.

26

In the context of a purported HALLEX violation, prejudice results if the "claimant was denied a procedural right at the hearing itself or [there is] a defect resulting from some evidence that was or was not considered at the hearing." *Melvin v. Astrue*, 602 F. Supp. 2d 694, 704 (E.D.N.C. 2009) (citing *Howard v. Astrue*, 505 F. Supp. 2d 1298, 1302 (S.D. Ala. 2007)).  But the VE who testified at Claimant's hearing was qualified to do so, and Claimant had ample opportunity to ask her about her qualifications during the hearing.

To be qualified to testify in a proceeding such as this one, a VE "must have expertise and current knowledge of working conditions and physical demands of various jobs; knowledge of the existence and numbers of those jobs in the national economy; and involvement in or knowledge of placing adult workers with disabilities into jobs." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019) (quoting HALLEX I-2-1-31 B.1, 2016 WL 3382786, at *1) (alterations and internal quotation marks omitted).  The VE's curriculum vitae reflects that she received a master's degree in rehabilitation counseling in June 2006 and that she has prior professional experience as a vocational case manager, vocational rehabilitation counselor, and vocational rehabilitation consultant, dating to June 2003. (Tr. at 390—91.)  It also indicates that at the time of the hearing in this case on February 21, 2018, the VE had been employed for two years at MetLife Disability as a vocational rehabilitation consultant.  (*Id.* at 391–92.)  Her duties in that position included "assist[ing] employees on [long-term] disability with returning to work within their abilities," coordinating with national employers to return those employees to work "with strong focus on the employee's abilities and skills," and partnering with other organizations "to maximize return to work resources and opportunities."  (*Id.* at 391.) Claimant cannot seriously contend that an individual with fifteen years' experience in vocational rehabilitation was not qualified to give VE testimony in this proceeding.

In fact, she does not so contend.  (*See* ECF No. 13 at 6–7.)  Claimant's lone specific objection to the VE's actual qualifications is that she "is employed by an Insurance Company."  (*Id.* at 6.)  But Claimant cites to no cases, and the undersigned has found none, holding that a VE is not qualified merely because she performs vocational rehabilitation consulting for an insurance company.  (*See id.*)

Claimant also asserts, "Since the Agency has the burden to show that a VE is qualified, we can only presume she was not."  (*Id.* at 6–7.)  Claimant suggests that the burden was not met because the VE's résumé was not included in the administrative record prior to the hearing.  (*See id.* at 5.)  But as the Government points out (ECF No. 16 at 6), the ALJ confirmed during the hearing that the résumé was in the administrative record at that time but may have been added "after [Claimant's counsel] looked at [the record]."  (Tr. at 58.)  The fact that Claimant's counsel did not find the VE's résumé until after the hearing does not indicate that the ALJ should not have considered the VE's testimony.  *See Bullock v. Saul*, No. 7:18-cv-174-RJ, 2019 WL 4643854, at *4 (E.D.N.C. Sept. 23, 2019) (rejecting claimant's argument that ALJ erred by relying on VE's testimony because her résumé was not in the record, when it was in the record and claimant's counsel did not object to VE's qualifications at hearing).

Moreover, if Claimant's counsel were truly concerned about the VE's qualifications, he simply could have asked her about her education and experience during the hearing.  *See Chandler v. Colvin*, No. 8:13-cv-01331-DCN, 2014 WL 4809902, at *3 (D.S.C. Sept. 26, 2014) (rejecting claimant's objection to ALJ's reliance on VE testimony when claimant "had ample opportunity to question the VE's qualifications at the hearing and failed to do so").  That he chose not to do so means that he, not the Commissioner,

"left [Claimant] without the opportunity for fair cross examination" of the VE.  (ECF No. 13 at 7.)

Accordingly, the undersigned **FINDS** that although a violation of HALLEX provides no basis for remand, even assuming such a violation occurred in this case, Claimant suffered no prejudice from it because the VE was qualified to testify.

### C. *Hypothetical Questions to VE*

Finally, Claimant argues that the ALJ improperly failed to discuss in her decision all the hypotheticals presented to the VE during the hearing, including those posited by Claimant's counsel.  (ECF No. 13 at 10–13.)  But—as illustrated by the absence of any legal support for such a proposition in Claimant's brief—no such rule exists.  *See Woodlief v. Berryhill*, No. 5:16-cv-191-FL, 2017 WL 9478528, at *5 (E.D.N.C. Aug. 4, 2017) (rejecting claimant's argument "that the ALJ erred by asking the VE a hypothetical question involving a sit/stand option without expressly stating why such an option was not needed in the RFC"), *adopted by* 2017 WL 4164076 (E.D.N.C. Sept. 20, 2017).

The ALJ's hypothetical questions to the VE "need only incorporate those limitations which are credibly established in the record."  *Manley v. Berryhill*, No. 2:17-cv-02293, 2018 WL 3423821, at *3 (S.D.W. Va. July 16, 2018) (citing *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989)); *see Hines v. Barnhart*, 453 F.3d 559, 566 (4th Cir. 2006) ("In order for a [VE's] opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." (quoting *Walker*, 889 F.2d at 50)).  The ALJ may present alternative hypotheticals to the VE, "even if they are contradictory," and may "determine after the hearing which hypothetical is supported by the record evidence."  *Hart v. Berryhill*, No. 5:18-cv-208-D, 2019 WL

1759741, at \*6 (E.D.N.C. Mar. 26, 2019) (quoting *Woodlief*, 2017 WL 9478528, at \*5); *see Davis v. Apfel*, 162 F.3d 1154 (4th Cir. 1998) (per curiam) (table), 1998 WL 559728, at \*2 (stating that hypothetical questions that alternatively included claimant's subjective complaints and did not include them "were entirely proper" because hypothetical not equivalent to "findings of fact"). To that end, "an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a Claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ." *Farnsworth v. Astrue*, 604 F. Supp. 2d 828, 858 (N.D.W. Va. 2009) (report and recommendation of magistrate judge) (quoting *France v. Apfel*, 87 F. Supp. 2d 484, 490 (D. Md. 2000)).

However, to require the ALJ to explain in detail why a particular hypothetical was rejected is simply redundant of the RFC assessment. For instance, in this case, Claimant's counsel's hypothetical asked the VE to imagine an individual who was limited as the ALJ previously described but would also require frequent postural changes and a sit/stand option but could not perform fine motor movements. (Tr. at 65.) Claimant correctly states that the VE testified that no work would be available for such an individual. (*Id.*; *see* ECF No. 13 at 10.) Claimant represents that her "lower extremity osteoarthritis" necessitates frequent postural changes and a sit/stand option. (ECF No. 13 at 10.) But in the RFC assessment, the ALJ explained that although Claimant reported experiencing knee pain for several years, she did not receive "continuous follow up treatment for her knee issues for several years, suggesting her knee was not causing significant limitations," and the objective findings from imaging of her knees and hips were mild. (Tr. at 22.) The ALJ further noted that Claimant was still able to perform many activities of daily living, which "support strong functioning and that [Claimant's conditions] were not significantly limiting her." (*Id.*) Claimant also argues that her carpal tunnel syndrome limits her fine

30

manipulation skills.  (ECF No. 13 at 10–11.)  In the RFC assessment, the ALJ explained that "hand restrictions are not assigned" because Claimant did not receive much treatment for carpal tunnel syndrome but was nonetheless able to perform daily activities like feeding her pets, using the computer, and doing crafts, which the ALJ reasoned "supports good hand manipulation, inconsistent with [Claimant's] testimony."  (Tr. at 22–23.)  The ALJ further observed that there was no record evidence of "continued symptoms" of carpal tunnel syndrome after Claimant had releases performed on each of her hands.  (*Id.* at 23.)  Accordingly, while the ALJ made no specific reference to the additional limitations posed by Claimant's counsel's hypothetical question to the VE, she clearly explained in her RFC assessment why those limitations were not supported by the record.

In sum, the undersigned **FINDS** that the ALJ properly relied on the VE's testimony to the extent it reflected the ALJ's adequately explained RFC assessment.

## *IV.    CONCLUSION*

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 12), **GRANT** the Commissioner's request to affirm his decision (ECF No. 16), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of

this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown.  Copies of any objections shall be served on opposing parties and provided to Judge Chambers.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: March 30, 2020

Dwane L. Tinsley
United States Magistrate Judge